IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

CONSOLIDATED EDISON COMPANY OF
NEW YORK, INC. Et al

      Plaintiffs

         V.                                  CIVIL ACTION
                                              NO. 1:05CV01467(EGS)

Secretary of Energy, United States
et

      Defendants

---

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs respectfully move for summary judgment, as follows:

(i) An ORDER reversing and vacating the award by the Office of Hearings and Appeals of the Department of Energy ("OHA") and "DOE") to the Lubrizol Corporation by Decision issued August 12, 2004 as affirmed by Supplemental Order issued June 27, 2005 to the extent to which it awarded crude oil refunds on the basis of the purchase of 335,623,021 gallons of "various base oils."

(ii) An ORDER remanding the matter to OHA for reduction of the award to Lubrizol Corporation from $557,736 to $20,738.

In support of this motion, plaintiffs submit a Statement of Material Facts, a Statement of Points and Authorities and a Proposed Order.

1

Plaintiffs respectfully request the opportunity to offer oral argument in support of this Motion.


Respectfully submitted,


_____

Philip P. Kalodner
208 Righters Mill Road
Gladwyne PA 19035
DC Bar 973578

Attorney for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

CONSOLIDATED EDISON COMPANY OF
NEW YORK, INC. Et al

     Plaintiffs

       V.                   CIVIL ACTION
                             NO. 1:05CV01467(EGS)
SAMUEL BODMAN
Secretary of Energy, United States
et

     Defendants

---

<u>PLAINTIFFS' STATEMENT OF MATERIAL FACTS</u>

<u>IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

Plaintiffs submit the following facts as those material to their accompanying Motion for Summary Judgment and Statement of Points and Authorities in Support. Plaintiffs asserts that there are no genuine issues with respect to such facts:

1. In their Complaint, a group of Utilities and Manufacturers ("Utilities and Manufacturers") who are entitled to a significant portion of crude oil refunds recovered by the Department of Energy ("DOE") challenge an award by DOE's Office of Hearings and Appeals ("OHA") of crude oil refunds to the

1

Lubrizol Corporation ("Lubrizol").

2. Specifically, the award to Lubrizol is challenged to the extent to which it is based on Lubrizol's purchases of 335,623,921 gallons of "various base oils" (hereinafter "335.6 million gallons"), i.e. some $536,998 of the $557,736 awarded to Lubrizol. If sustained, the challenge will also reduce the additional distributions which would be made to Lubrizol in DOE's final distribution of crude oil refunds by an amount of approximately $258,430.

3. Should the challenge to the Lubrizol award be sustained, the almost $800,000 which would be recovered from Lubrizol or not distributed to it, would be distributed to some 31,000 claimants whose applications for crude oil refunds have been approved by OHA. The plaintiffs in this action, Utilities and Manufacturers, would receive as a pro rata share almost $100,000 of that amount, and the other 31,000 claimants some $700,000. The instant action was brought as a class action on behalf of all 31,000 claimants.

A. THE REGULATORY BACKGROUND

4. Pursuant to a Settlement Agreement in In re The Department of Energy Stripper Well Exemption Litigation, ("Stripper Well"), 653 F. Supp. 108 (D. Kan. 1986), in an Order published April 10, 1987, (52 Fed. Reg. 11737) DOE committed itself to a program in which end users of refined petroleum products purchased in the United States during the period of

2

price regulation of crude oil, August 1973 through January 1981, would be eligible to receive an appropriate portion of the crude oil refunds recovered by the DOE, i.e. for each claimant end user, the percentage of the refunds which its purchase volume represented of the total end use consumption of refined oil products during the regulatory period as found by DOE, to wit 2,020,997,335,000 gallons. DOE further committed to calculating such by dividing the "crude oil refund recoveries" which it obtained by the 2,020,997,335,000 gallons of refined petroleum products purchased by end users to calculate a per gallon ("volumetric") amount, and then distributing to each successful claimant in the proceedings before it an amount calculated by multiplying such "volumetric" by the volume of qualifying purchases by such claimant. In determinating the "crude oil refund recoveries", DOE determined to add to the actual amounts recovered by it, the amounts initially distributed in Stripper Well to those other than Refiners, Resellers and Retailers i.e. $985 million, so that the claimants in the DOE proceedings would have "full parity" with those end users who qualified for, and received, funds in Stripper Well; the end users participating in Stripper Well received from Stripper Well funds their pro rata share both of the funds recovered in Stripper Well and the anticipated amounts to be distributed by DOE to the claimants in its crude oil refund proceedings, and accordingly, DOE declared

3

that "full parity" required a similar treatment for those claiming in the DOE proceedings, i.e. receipt from the funds to be distributed by DOE of their pro rata share of the funds distributed in Stripper Well as well as of the funds to be distributed in the DOE proceedings. The amounts distributed from Stripper Well funds to refiners, resellers and retailers represented such portion of both the funds in Stripper Well and the funds to be distributed in the DOE proceedings deemed by those negotiating the settlement to reflect the extent to which refiners, resellers and retailers had absorbed the crude oil overcharges for which refunds were recovered before passing along the overcharges downstream to the end users of refined petroleum products. The end users, refiners, resellers and retailers recovering in Stripper Well were required to waive any right to recovery in the DOE crude oil refund proceedings, reflecting the fact that they were recovering in Stripper Well an appropriate share of the funds to be distributed in the DOE crude oil refund proceedings.

5. In the DOE crude oil refund proceedings some 100,000 claims were filed, practically all of them for the end use of refined petroleum products. As to such end users-- those who used refined petroleum products to produce non-petroleum products for which no subsequent purchaser could assert the right to crude oil refunds-- the DOE recognized a presumption of injury, i.e. that

4

they were unable to pass through the overcharge they had paid to their customers. In those few cases in which resellers of refined petroleum products applied for crude oil refunds, the DOE consistently held that they were not entitled to a presumption of injury, but were required to prove the extent of their absorption of the injury caused by crude oil overcharges. To the best of plaintiffs' knowledge, no reseller claimant was found by DOE to have provided such proof; accordingly, no reseller of refined products has been awarded crude oil refunds in the DOE proceedings.

6. In the Stripper Well Settlement Agreement, it was assumed by all parties, including the DOE, that 20% of the recovered crude oil refunds would be more than sufficient to provide the refunds required by the "volumetric" formula for all claimants who would apply; accordingly, the balance of the recovered funds upon their recovery were divided equally between the United States Treasury and the States of the United States, without awaiting the processing of claims by end users. The basis of the assumption that 20% would be sufficient was that many end users would have claims too small to file and many eligible claims would share the Stripper Well funds and would waive the right to claim in the DOE proceedings.

7. In fact, claims were filed and found valid which would require substantially more than 20% of the recovered funds were

5

DOE to implement the "volumetric" formula to which it had
committed.

8. Because of the limitation that only 20% of the recovered
funds could be used to fund the "volumetric" formula for
claimants awards, the successful claimants in the DOE
proceedings, i.e. plaintiffs and the class, have been and will be
unable to recover the full amount of the "volumetric" to which
they are entitled pursuant to the DOE formula. The extent to
which plaintiffs and the class will be denied recovery of the
"volumetric" will be increased to the extent to which awards are
made on the basis of purchase volumes not qualified for crude oil
refund awards, including specifically any volume of purchases for
which claims are made by both resellers and end users.

9. Not only did DOE initially promulgate a formula which
assumed that there would be only one claimant eligible as to each
gallon of purchased petroleum product (Notice at 52 Fed. Reg.
11737, April 10, 1997), but it continued to demonstrate
commitment to the one gallon-one claim principle, inter alia (i)
by imposing on reseller claimants a burden of demonstrating that
they absorbed the overcharges and in the absence of such proof
consistently rejecting reseller claims, and (ii) when setting
policy as to qualifying products, expressing concern that such
might award refunds for product not produced in a crude oil
refinery, and therefore not in the 2,020,997,335,000 gallons used

6

in the calculation of the "volumetric." (Notice at 57 Fed. Reg.
30731, July 10, 1992).

B. THE HISTORY OF THE LUBRIZOL APPLICATION

        10. In a Decision issued August 12, 2004, OHA awarded
Lubrizol a refund of $557,736 based upon its "purchases of
348,585,189 gallons of various oils, fuel oil, gasoline and
solvents."  The Decision explains that of the approved volume
some 13 million gallons represented gasoline (approximately 7
million gallons) and solvents (approximately 6 million gallons),
and described the balance of purchases, 335,623,021 gallons as
being of "various base oils."

        11. In accordance with the consistent practice of Utilities
and Manufacturers to review all major crude oil refund awards on
behalf of approved claimants in order to preclude any dilution of
the refunds available to such previously approved claims by
virtue of unjustified awards, Utilities and Manufacturers
initiated litigation in the District Court for the District of
Columbia District, as of Consolidated Edison Company of New York
Inc. Et al v. Spencer Abraham, Secretary of Energy et al, Civil
Action 04-1732 (EGS). In their Complaint, Utilities and
Manufacturers asserted there was insufficient basis for the award
to Lubrizol based on the purchase of 335.6 million gallons of
base oils, noting inter alia, the absence of proof that such base
oils were the product of a crude oil refinery subject to the

7

Entitlements Program, and the absence of proof that all such purchases were made in the United States.

12. By Motion, DOE sought and obtained the dismissal of the Complaint without prejudice so that it might review the award. In such Motion, DOE submitted that in its further proceedings reviewing the award, "plaintiffs' counsel will have full opportunity to intervene and submit evidence and pleadings on any matter germane to the issues involved in the proceeding."

13. After receiving two written submissions from Lubrizol, and responses thereto by the Utilities and Manufacturers, but without holding a hearing, on June 27, 2005, OHA issued a Supplemental Order reviewing and rejecting the objections of Utilities and Manufacturers to the award of crude oil refunds on the basis of the purchase of the 335.6 gallons of "base oils.

14. Specifically, as it relates to this appeal, OHA considered and rejected the challenge to such an award made by Utilities and Manufacturers "on the basis that Lubrizol essentially was a reseller of petroleum products and as such is not entitled to a refund in the crude oil refund proceeding." Although Utilities and Manufacturers also argued that the Lubrizol had failed to demonstrate that the base oils were produced in a crude oil refinery, and that Lubrizol had failed to demonstrate that the refineries from which the base oils were purchased were domestic refineries subject to the Entitlements

8

Program, both requisites for an award of crude oil refunds,
Utilities and Manufacturers do not here appeal OHA's
determination that such requirements were satisfied, focusing
instead and solely on the failure of Lubrizol to demonstrate that
it was an end user of the base oils, and OHA's acknowledgment
that an award of crude oil refunds for Lubrizol's base oil
purchases would mean that two or more claimants could recover on
the same gallon of base oils, thereby offending the basic
assumption and the basic principle of the crude oil refund
program.

C.   THE RELEVANT FACTS IN THE LUBRIZOL APPLICATION

15. The Objections filed by Utilities and Manufacturers upon
the remand to OHA focused on the acknowledgment by Lubrizol that
the 335.6 million gallons of "base oil" for which Lubrizol
claimed refunds are properly described as "carrying agents"
because they are used as "diluents for chemicals that would
otherwise be too thick to handle conveniently. Additives are made
in liquid form, using oils, for ease of incorporation into the
customer's product. In essence these oils 'carry' the additive
chemicals-- thus they are referred to as carrying agents."
Utilities and Manufacturers noted that Lubrizol had acknowledged
that a substantial portion of its "additive packages" containing
the base oils as diluents were sold to domestic oil companies,
and that the Lubrizol products were added by its customers to

9

petroleum products, and then sold as refined petroleum product.
Utilities and Manufacturers asserted that, accordingly, there
were in many, if not most, cases downstream end users who could
assert an end use claim on petroleum product including the "base
oils" on the basis of which much of Lubrizol's claim rested.

16. The Utilities and Manufacturers Objections noted that
earlier in the proceedings before OHA, OHA had considered the
possibility that Lubrizol was a reseller not an end user and
advised Lubrizol that a reseller was obligated to "make a
detailed showing of injury"; implicit in such advice was that OHA
had found that Lubrizol's previous submission attempting to
demonstrate injury was inadequate to do so.

17. Faced with the focus of Utilities and Manufacturers'
Objections on the issue of whether Lubrizol was a reseller, not
an end user, because its products were refined petroleum product
subject to crude oil refund claims by those downstream (either
immediately or after the addition of other petroleum product by
refiners or others in the oil industry), Lubrizol responded by
carefully attempting to avoid the basic issue-- whether Lubrizol
was not an end user but rather a reseller of the 335.6 million
gallons of base oils to which it added chemicals to make what it
describes as an "Lubrizol Additive Package."

18. In its response, Lubrizol effectively acknowledged that
there were end users downstream who would be able to claim crude

10

oil refunds based upon the very same base oil volume upon which
Lubrizol was relying for its claim. Lubrizol explained that it
sells its "additive packages" containing the base oil to
customers who "blend that package with oil that they made or
purchased from a refiner or resellers," to produce what Lubrizol
describes as "fully formulated lubricant." Lubrizol does not
deny, and indeed it seems clear from the material submitted by it
that it acknowledges, that a substantial amount of its "additive
package" product, including the "base oils" produced by it, finds
its way into engine oils, gasoline and diesel fuels after
Lubrizol's customers add additional oil ("customer base stock")
to make "fully formulated lubricants."

19. Thus, it seems clear that the base oil gallons on the
basis of which Lubrizol claims crude oil refunds are part of
gallons of refined petroleum product ultimately purchased and
used by end users, in automobiles, trucks, tractors, industrial
machines etc., and most importantly are therefore subject to a
claim for crude oil refunds by such end users.

20. Lubrizol provided no information which would enable OHA
to determine to what extent the base oils it claimed could also
be claimed by an end user downstream even though it knew that
such was the focus of Utilities and Manufacturers' objections.
The implication of Lubrizol's failure to provide such information
is that Utilities and Manufacturers were correct in asserting

11

that the "base oils" claimed by Lubrizol could properly be
claimed by others downstream, and perhaps in many cases were so
doubly claimed.

21. As Utilities and Manufacturers explained, using
hypothetical figures in the absence of Lubrizol's willingness to
provide actual relevant volumes, if one gallon of base oil used
to make an "additive package" and one gallon in chemicals added
by Lubrizol has added to it two gallons of "customer base stock"
by the marketer to which Lubrizol sells its product, and the
"fully formulated lubricant" which is the result is then added to
20 gallons of gasoline, and sold to a motorist or trucker, the
gallons for which the end user would claim is 24 gallons, i.e.
the gallon of base oil used by Lubrizol, the gallon of chemicals
added by Lubrizol, the two gallons of "customer base stock" and
the 20 gallons of gasoline. If Lubrizol is permitted to recover
crude oil refunds for the one gallon of base oil, if the Lubrizol
customer is permitted to claim for the two gallons of "customer
base stock" which it had purchased and which it added, and the
farmer or truck driver permitted to claim for the 24 gallons of
gasoline or diesel which he purchased, the effect would be claims
of 27 gallons of end use whereas in fact the end use gallons were
only 24.

D.  THE OHA SUPPLEMENTAL ORDER AFFIRMING ITS PRIOR DECISION

22. In its Supplemental Order of June 27, 2005 from which

12

this appeal is taken, OHA recognized the possibility as asserted by Utilities and Manufacturers that awarding refunds to Lubrizol on its base oil purchases might result in a violation of the one gallon-one refund principle, observing only that OHA had "no evidence indicating what percentage of Lubrizol products were sold to oil companies... (and that) it is uncertain how or in what proportions oil companies mixed their Lubrizol products as alleged in the hypothetical". OHA accordingly concluded that the "evidence is not sufficient for us to conclude that granting Lubrizol a refund as an end-user would result in significant double counting of petroleum product gallons for refund purposes."

23. The OHA Supplemental Order explained that OHA had declined to require Lubrizol to provide the information required for an assessment of the extent of the double counting problem on the basis that such "would be inappropriate given the purpose of this proceeding and the ground rules announced at the outset of these proceedings." (citing for such "ground rules" a footnote in an April 10, 1987 Order).

24. OHA cited as a further reason for declining to require Lubrizol to bear its burden of demonstrating whether the base oils were in fact double counted that it is too late to do so because "OHA has already announced procedures for conclusion of the crude oil refund proceeding", ignoring the fact that the

13

"timing" problem was caused by OHA delaying from December 22,
1987 when Lubrizol filed its claim until August 12, 2004 to file
its initial decision granting the Lubrizol award.

25. OHA concluded that Lubrizol was an end-user entitled to
a presumption of injury because it was not a reseller, because
"by adding chemicals to the petroleum products it purchased from
refineries, (Lubrizol) substantially changed the form of the
petroleum products it purchased." For that finding, OHA evidently
relied on Lubrizol's statement that because the base oils were
added to chemicals "oil is an integral part of their (the
'additive packages' produced by Lubrizol) manufacture."

26. Indeed, OHA's explanation that the "additive packages
were then sold (by Lubrizol) not as petroleum products themselves
but as a product which when added to a purchaser's oil would
produce a change in the physical and chemical properties of the
purchaser's oil" might well have led not only to the double
counting described in the hypothetical, but to triple counting,
i.e. the ability of three separate claimants to assert the right
to crude oil refunds on the same gallon of base oils. Lubrizol
would be entitled to claim on the gallon of base oil which it
added to its chemicals to make the "additive package." The
purchaser from Lubrizol, if a refiner or reseller of oil
products, would be entitled to claim on the basis of the gallon
of base oil included in the "additive package" purchased frm

14

Lubrizol (as well as on the basis of the oil into which it mixed the additive package) because the "resulting change in the physical and chemical properties of the purchaser's oil" would make it, too, an end-user. And, finally the true end user to whom the oil with additives was sold and who used it, e.g. to power an engine, would be entitled to crude oil refunds on the basis of the same included gallon of base oil.


                              Respectfully submitted,

                              _____

                              Philip P. Kalodner
                              208 Righters Mill Road
                              Gladwyne PA 19035
                              DC Bar 973578

December 8, 2005              Attorney for Plaintiffs

15

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CONSOLIDATED EDISON COMPANY OF
NEW YORK, INC. Et al

    Plaintiffs

       V.                    CIVIL ACTION
                             NO. 1:05CV01467(EGS)
Secretary of Energy, United States
et

    Defendants

STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF

MOTION FOR SUMMARY JUDGMENT

                              Philip P. Kalodner
                              208 Righters Mill Road
                              Gladwyne PA 19035
                              DC Bar 973578

December 9, 2005      Attorney for Plaintiffs

TABLE OF CONTENTS

INTRODUCTION: THE ISSUE PRESENTED
AND ITS SIGNIFICANCE                                      1

STATEMENT OF FACTS

      A. THE REGULATORY BACKGROUND                   6

      B. THE HISTORY OF THE LUBRIZOL APPLICATION     11

      C. THE RELEVANT FACTS IN THE
      LUBRIZOL APPLICATION                           13

      D. THE OHA SUPPLEMENTAL ORDER AFFIRMING
      ITS PRIOR DECISION                             17

ARGUMENT                                                 19

I   DESPITE OHA'S ATTEMPT TO DISGUISE THE FACT,
ITS LUBRIZOL DECISION CONSTITUTES AN ENDORSEMENT
OF THE 'DOUBLE COUNTING OF PETROLEUM PRODUCT GALLONS
FOR REFUND PURCHASES" IN VIOLATION OF THE
FUNDAMENTAL PRINCIPLE OF "ONE GALLON-ONE CLAIM"          19

II   THE INFORMATION PROVIDED BY LUBRIZOL
DEMONSTRATES THAT IT WAS A "RESELLER" AS TO THE
BASE OILS, i.e. THAT THERE WAS A DOWNSTREAM END
USER; ITS, AND DOE'S, ATTEMPTS TO AVOID SO
RECOGNIZING ARE OF NO AVAIL                              22

III   BY AWARDING REFUNDS TO LUBRIZOL ON THE BASIS
OF VOLUMES WHICH COULD ALSO BE CLAIMED BY A
DOWNSTREAM END USER, OHA HAS VIOLATED THE ESSENTIAL
PRINCIPLES WHICH IT ESTABLISHED AND WHICH IT HAS
CONSISTENTLY APPLIED                                     32

CONCLUSION                                               38

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

CONSOLIDATED EDISON COMPANY OF
NEW YORK, INC. Et al

    Plaintiffs

        V.                    CIVIL ACTION
                            NO. 1:05CV01467(EGS)
SAMUEL BODMAN
Secretary of Energy, United States
et

    Defendants

---

STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF

MOTION FOR SUMMARY JUDGMENT


INTRODUCTION: THE ISSUE PRESENTED AND ITS SIGNIFICANCE

In their Complaint, a group of Utilities and Manufacturers ("Utilities and Manufacturers") who are entitled to a significant portion of crude oil refunds recovered by the Department of Energy ("DOE") challenge an award by DOE's Office of Hearings and Appeals ("OHA") of crude oil refunds to the Lubrizol Corporation ("Lubrizol").

Specifically, the award to Lubrizol is challenged to the extent to which it is based on Lubrizol's purchases of 335,623,921 gallons of "various base oils" (hereinafter "335.6 million gallons"), i.e. some $536,998 of the $557,736 awarded to

1

Lubrizol. If sustained, the challenge will also reduce the additional distributions which would be made to Lubrizol in DOE's final distribution of crude oil refunds by an amount of approximately $258,430.

Should the challenge to the Lubrizol award be sustained, the almost $800,000 which would be recovered from Lubrizol, or not distributed to it, would be distributed to some 31,000 claimants whose applications for crude oil refunds have been approved by OHA. The plaintiffs in this action, Utilities and Manufacturers, would receive as a pro rata share almost $100,000 of that amount, and the other 31,000 claimants some $700,000. The instant action was brought as a class action on behalf of all 31,000 claimants.

The issue raised in this appeal is whether OHA on behalf of DOE may abandon and ignore the central principle which has informed its adjudication of more than 100,000 claims for crude oil refunds and its distribution of more than $610 million to claimants, to wit that crude oil refunds are to go to "end users" of refined petroleum products, i.e. those who consume the petroleum product to produce energy or who convert the petroleum product into a non-petroleum product.

For more than 17 years in processing claims, OHA has consistently and repeatedly denied claims from those who have acted as "resellers", i.e. have passed on downstream as petroleum product the volume of refined product which they purchased. OHA

2

has held consistently that such "resellers" may recover crude oil refunds only to the extent to which they are able to demonstrate that they absorbed the increased product cost which had resulted from crude oil overcharges, i.e. to the extent to which they had not been able to pass on downstream the increased product prices they had paid as a result of crude oil overcharges. To the best of the Utilities and Manufacturers' knowledge, no such "reseller" has been able to demonstrate such absorption and therefore no such "reseller" has been approved as a crude oil refund claimant in the DOE proceedings.

OHA has only made awards to "end users", i.e. those who did not sell a product to customers which could be characterized as a petroleum product, and therefore the possible basis of a crude oil refund claim by another. OHA has held that only such "end users" are entitled to a "presumption of injury" and are therefore not required to demonstrate that they were unable to pass along the higher prices of the petroleum products they were using which had been caused by overcharges in the price of crude oil.

In the instant award to Lubrizol, OHA has for the first time determined to make a crude oil refund award even though the volume of refined product on which such award is based may be the basis of a claim for crude oil refunds by a downstream purchaser of the Lubrizol products.

3

Such an endorsement of double recovery on the same refined product volume is inconsistent with, and offends, the very basis on which OHA has calculated the per gallon recovery to which each successful claimant is entitled.

The formula which OHA promulgated to distribute the crude oil refunds it recovered divided the crude oil refunds recovered by DOE (including $985 million recovered in In re The Department of Energy Stripper Well Exemption Litigation, 653 F. Supp. 108 (D. Kan. 1986)) by the total volume of end use purchases of refined petroleum product by all domestic "end users" during the 1973 to 1981 regulatory period, i.e. 2,020,997,335,000 gallons, to calculate the amount per gallon to which each approved claimant was entitled,. (This amount per gallon was denominated by DOE as the "volumetric", and will so referred to here). Pursuant to the DOE formula, each claimant would be entitled to a refund calculated by multiplying the "volumetric" by the gallons of qualifying product purchased by such claimant during the regulatory period.

To award to two claimants on the basis of the same gallons is inconsistent with the formula used by DOE which was based on the assumption that there would be one claimant for each gallon. It would pose the conceptual possibility that DOE would be required to pay out more refunds than it had recovered.

More importantly in real world terms, such potential double

4

recovery on the same gallons reduces the per gallon amount which each of the approved claimants will receive, and it is for that reason that Utilities and Manufacturers have challenged DOE's award here and its violation of the "one gallon-one purchaser" principle which is at the heart of the DOE crude oil refund distribution formula.

Such is the case because DOE has reserved for distribution to claimants only 20% of the crude oil refunds it has recovered, distributing the other 80%, half to the U.S. Treasury and half to the States of the United States.

It has done so on an assumption made when DOE agreed to a crude oil refund distribution process that claims would be made on the basis of the purchase of substantially less than 20% of the gallons of end use during the regulatory period. Had such been the case, no harm would have been done to the end user claimants by an award to a claimant such as Lubrizol on gallons which could also be the basis of a claim by another.

As it has turned out, claims have been made by end users in such volume as would require distribution of more than the 20% reserved were the formula to be implemented as adopted by DOE.

However, DOE has limited the implementation of the formula to the 20% available. The result is that the approved claimants will receive less per gallon than the formula-calculated "volumetric", and such would be the case even if two awards were

5

not being made on the same gallons.

The violation of the principle of "one gallon-one refund" which OHA has here endorsed and here implemented will further exacerbate the problem, i.e. will further reduce the extent to which the 31,000 claimants will be deprived of the "volumetric" to which DOE has determined they are entitled by the formula.

It is for that reason that Utilities and Manufacturers have challenged the award to Lubrizol on the basis of gallons which may also have been claimed for by other claimants, and in all likelihood which have been the basis to awards to others.


STATEMENT OF FACTS

A. THE REGULATORY BACKGROUND

_____ Pursuant to a Settlement Agreement in In re The Department of Energy Stripper Well Exemption Litigation, ("Stripper Well"), 653 F. Supp. 108 (D. Kan. 1986), in an Order published April 10, 1987 (52 Fed. Reg. 11737, April 10, 1987), DOE committed itself to a program in which end users of refined petroleum products purchased in the United States during the period of price regulation of crude oil, August 1973 through January 1981, would be eligible to receive an appropriate portion of the crude oil refunds recovered by the DOE, i.e. for each claimant end user, the percentage of the refunds which its purchase volume represented of the total end use consumption of refined oil

products during the regulatory period as found by DOE, to wit
2,020,997,335,000 gallons. DOE further committed to calculating
such by dividing the "crude oil refund recoveries" which it
obtained by the 2,020,997,335,000 gallons of refined petroleum
products purchased by end users to calculate a per gallon
("volumetric") amount, and then distributing to each successful
claimant in the proceedings before it an amount calculated by
multiplying such "volumetric" by the volume of qualifying
purchases by such claimant.

        In determining the "crude oil refund recoveries", DOE
determined to add to the actual amounts recovered by it, the
amounts initially distributed in Stripper Well to those other
than Refiners, Resellers and Retailers i.e. $985 million, so that
the claimants in the DOE proceedings would have "full parity"
with those end users who qualified for, and received, funds in
Stripper Well. The end users participating in Stripper Well
received from Stripper Well funds their pro rata share both of
the funds recovered in Stripper Well and the anticipated amounts
to be distributed by DOE to the claimants in its crude oil refund
proceedings. Accordingly, DOE declared that "full parity"
required a similar treatment for those claiming in the DOE
proceedings, i.e. receipt from the funds to be distributed by DOE
of their pro rata share of the funds distributed in Stripper Well
as well as of the funds to be distributed in the DOE proceedings.

The amounts distributed from Stripper Well funds to
refiners, resellers and retailers represented such portion of
both the funds in Stripper Well and the funds to be distributed
in the DOE proceedings deemed by those negotiating the settlement
to reflect the extent to which refiners, resellers and retailers
had absorbed the crude oil overcharges for which refunds were
recovered before passing along the overcharges downstream to the
end users of refined petroleum products. The end users, refiners,
resellers and retailers recovering in Stripper Well were required
to waive any right to recovery in the DOE crude oil refund
proceedings, reflecting the fact that they were recovering in
Stripper Well an appropriate share of the funds to be distributed
in the DOE crude oil refund proceedings.

In the DOE crude oil refund proceedings some 100,000 claims
were filed, almost all of them for the end use of refined
petroleum products. As to such end users-- those who used refined
petroleum products to produce non-petroleum products for which no
subsequent purchaser could assert the right to crude oil
refunds-- the DOE recognized a presumption of injury, i.e. a
presumption that they were unable to pass through the overcharge
they had paid to their customers.

In those few cases in which resellers of refined petroleum
products applied for crude oil refunds, the DOE consistently held
that they were not entitled to a presumption of injury, but were

8

required to prove the extent of their absorption of the injury caused by crude oil overcharges. To the best of plaintiffs' knowledge, until the award here to Lubrizol, no reseller claimant was found by DOE to have provided such proof; accordingly, no reseller of refined products has been awarded crude oil refunds in the DOE proceedings.

In the Stripper Well Settlement Agreement, it was assumed by all parties, including the DOE, that 20% of the recovered crude oil refunds would be more than sufficient to provide the refunds required by the "volumetric" formula for all claimants who would apply; accordingly, the balance of the recovered funds upon their recovery were divided equally between the United States Treasury and the States of the United States, without awaiting the processing of claims by end users. The basis of the assumption that 20% would be sufficient was that many end users would have claims too small to file and many eligible claimants would share in the Stripper Well funds and would waive the right to claim in the DOE proceedings.

In fact, claims were filed with DOE and found valid which would require substantially more than 20% of the recovered funds were DOE to implement the "volumetric" formula to which it had committed.

Because of the limitation that only 20% of the recovered funds could be used to fund the "volumetric" formula for

claimants awards, the successful claimants in the DOE proceedings, i.e. plaintiffs and the class, have been and will be unable to recover the full amount of the "volumetric" to which they are entitled pursuant to the DOE formula. The extent to which plaintiffs and the class will be denied recovery of the "volumetric" will be increased to the extent to which awards are made on the basis of purchase volumes not qualified for crude oil refund awards, including specifically any volume of purchases for which claims are made by both resellers and end users.

Not only did DOE initially promulgate a formula which assumed that there would be only one claimant eligible as to each gallon of purchased petroleum product (Notice at 52 Fed. Reg. 11737, April 10, 1987), but it continued to demonstrate commitment to the one gallon-one claim principle, inter alia (i) by imposing on reseller claimants a burden of demonstrating that they absorbed the overcharges and in the absence of such proof consistently rejecting reseller claims, and (ii) when setting policy as to qualifying products, expressing concern that such might award refunds for product not produced in a crude oil refinery, and therefore not in the 2,020,997,335,000 gallons used in the calculation of the "volumetric." (Notice at 57 Fed. Reg. 30731, July 10, 1992).

B. THE HISTORY OF THE LUBRIZOL APPLICATION

_____In a Decision issued August 12, 2004, OHA awarded Lubrizol a refund of $557,736 based upon its "purchases of 348,585,189 gallons of various oils, fuel oil, gasoline and solvents."  The Decision explains that of the approved volume some 13 million gallons represented gasoline (approximately 7 million gallons) and solvents (approximately 6 million gallons), and described the balance of purchases, 335,623,021 gallons as being of "various base oils." (Administrative Record, p. 227-228)

In accordance with the consistent practice of Utilities and Manufacturers to review all major crude oil refund awards on behalf of approved claimants in order to preclude any dilution of the refunds available to such previously approved claims by virtue of unjustified awards, Utilities and Manufacturers initiated litigation in the District Court for the District of Columbia District, as of Consolidated Edison Company of New York Inc. et al v. Spencer Abraham, Secretary of Energy et al, Civil Action 04-1732 (EGS). In their Complaint, Utilities and Manufacturers asserted there was insufficient basis for the award to Lubrizol based on the purchase of 335.6 million gallons of base oils, noting inter alia, the absence of proof that such base oils were the product of a crude oil refinery subject to the Entitlements Program, and the absence of proof that all such purchases were made in the United States.

11

By Motion, DOE sought and obtained the dismissal of the
Complaint without prejudice so that it might review the award. In
such Motion, DOE submitted that in its further proceedings
reviewing the award, "plaintiffs' counsel will have full
opportunity to intervene and submit evidence and pleadings on any
matter germane to the issues involved in the proceeding."

After receiving two written submissions from Lubrizol, and
responses thereto by the Utilities and Manufacturers, but without
holding a hearing, but without holding a hearing, on June 27,
2005, OHA issued a Supplemental Order reviewing and rejecting the
objections of Utilities and Manufacturers to the award of crude
oil refunds on the basis of the purchase of the 335.6 million
gallons of "base oils. (Administrative Record, p. 707-14).

Specifically, as it relates to this appeal, OHA considered
and rejected the challenge to such an award made by Utilities and
Manufacturers "on the basis that Lubrizol essentially was a
reseller of petroleum products and as such is not entitled to a
refund in the crude oil refund proceeding." (Administrative
Record, p. 707). Although Utilities and Manufacturers also argued
that Lubrizol had failed to demonstrate that the base oils were
produced in a crude oil refinery, and argued that Lubrizol had
failed to demonstrate that the refineries from which the base
oils were purchased were domestic refineries subject to the
Entitlements Program, both requisites for an award of crude oil

12

refunds, Utilities and Manufacturers do not here appeal OHA's determination that such requirements were satisfied, focusing instead and solely on the failure of Lubrizol to demonstrate that it was an end user of the base oils, and OHA's acknowledgment that an award of crude oil refunds for Lubrizol's base oil purchases would mean that two or more claimants could recover on the same gallon of base oils, thereby offending the basic assumption and the basic principle of the crude oil refund program.

C.    THE RELEVANT FACTS IN THE LUBRIZOL APPLICATION

The Objections filed by Utilities and Manufacturers upon the remand to OHA focused on the acknowledgment by Lubrizol that the 335.6 million gallons of "base oil" for which Lubrizol claimed refunds were used to dilute the chemicals which Lubrizol manufactured. As Lubrizol explained, the base oils are properly described as "carrying agents" because they are used as "diluents for chemicals that would otherwise be too thick to handle conveniently. Additives are made in liquid form, using oils, for ease of incorporation into the customer's product. In essence these oils 'carry' the additive chemicals-- thus they are referred to as carrying agents." (Administrative Record, p. 89).

In their Objections, Utilities and Manufacturers noted that Lubrizol had acknowledged that a substantial portion of its "additive packages" containing the base oils as diluents were

13

sold to domestic oil companies, and that the Lubrizol products were added by its customers to petroleum products, and then sold as refined petroleum product.

Utilities and Manufacturers asserted that, accordingly, there were in many, if not most, cases downstream end users who could assert an end use claim on petroleum product including the "base oils" on the basis of which much of Lubrizol's claim rested.

The Utilities and Manufacturers Objections noted that earlier in the proceedings before OHA, OHA had considered the possibility that Lubrizol was a reseller not an end user as to such base oils, and advised Lubrizol that a reseller was obligated to "make a detailed showing of injury"; implicit in such advice was that OHA had found that Lubrizol's previous submission attempting to demonstrate injury was inadequate to do so.

Faced with the focus of Utilities and Manufacturers' Objections on the issue of whether Lubrizol was a reseller, not an end user, because its products were refined petroleum product subject to crude oil refund claims by those downstream, Lubrizol responded by carefully attempting to avoid the basic issue-- whether Lubrizol was not an end user but rather a reseller of the 335.6 million gallons of base oils to which it added chemicals to make what it describes as an "Lubrizol Additive Package."

14

In its response, Lubrizol effectively acknowledged that
there were end users downstream who would be able to claim crude
oil refunds based upon the very same base oil volume upon which
Lubrizol was relying for its claim. Lubrizol explained that it
sells its "additive packages" containing the base oil to
customers who "blend that package with oil that they made or
purchased from a refiner or resellers," to produce what Lubrizol
describes as "fully formulated lubricant." (Administrative
Record, p. 529-530). Lubrizol does not deny, and indeed it seems
clear from the material submitted by it, that it acknowledges
that a substantial amount of its "additive package" product,
including the "base oils" produced by it, finds its way into
engine oils, gasoline and diesel fuels after Lubrizol's customers
add additional oil ("customer base stock") to make "fully
formulated lubricants."

Thus, it seems clear that the base oil gallons on the basis
of which Lubrizol claims crude oil refunds are part of gallons of
refined petroleum product ultimately purchased and used by end
users, in automobiles, trucks, tractors, industrial machines
etc., and most importantly are therefore subject to a claim for
crude oil refunds by such end users.

Lubrizol provided no information which would enable OHA to
determine to what extent the base oils it claimed could also be
claimed by an end user downstream, even though it knew that such

15

was the focus of Utilities and Manufacturers' objections. The implication of Lubrizol's failure to provide such information is that Utilities and Manufacturers were correct in asserting that to a substantial extent the "base oils" claimed by Lubrizol could properly be claimed by others downstream, and perhaps in many cases were so doubly claimed.

As Utilities and Manufacturers explained, using hypothetical figures in the absence of Lubrizol's willingness to provide actual relevant volumes, if one gallon of base oil used to make an "additive package" and one gallon in chemicals added by Lubrizol has added to it two gallons of "customer base stock" by the marketer to which Lubrizol sells its product, and the "fully formulated lubricant" which is the result is then added to 20 gallons of gasoline, and sold to a motorist or trucker, the gallons for which the end user would claim is 24 gallons, i.e. the gallon of base oil used by Lubrizol, the gallon of chemicals added by Lubrizol, the two gallons of "customer base stock" and the 20 gallons of gasoline. If Lubrizol is permitted to recover crude oil refunds for the one gallon of base oil, if the Lubrizol customer is permitted to claim for the two gallons of "customer base stock" which it had purchased and which it added, and the farmer or truck driver permitted to claim for the 24 gallons of gasoline or diesel which he purchased, the effect would be claims of 27 gallons of end use whereas in fact the end use gallons were

16

only 24.

D.  THE OHA SUPPLEMENTAL ORDER AFFIRMING ITS PRIOR DECISION

     In its Supplemental Order of June 27, 2005 from which this appeal is taken, OHA recognized the possibility, as asserted by Utilities and Manufacturers, that awarding refunds to Lubrizol on its base oil purchases might result in a violation of the one gallon-one refund principle, observing only that OHA had "no evidence indicating what percentage of Lubrizol products were sold to oil companies... (and that) it is uncertain how or in what proportions oil companies mixed their Lubrizol products as alleged in the hypothetical". OHA accordingly concluded that the "evidence is not sufficient for us to conclude that granting Lubrizol a refund as an end-user would result in significant double counting of petroleum product gallons for refund purposes." (Administrative Record, p. 712).

     The OHA Supplemental Order explained that OHA had declined to require Lubrizol to provide the information required for an assessment of the extent of the double counting problem on the basis that such "would be inappropriate given the purpose of this proceeding and the ground rules announced at the outset of these proceedings." (citing for such "ground rules" a footnote in its April 10, 1987 Order.

     OHA cited as a further reason for declining to require Lubrizol to bear its burden of demonstrating whether the base

17

oils were in fact double counted that it is too late to do so
because "OHA has already announced procedures for conclusion of
the crude oil refund proceeding", ignoring the fact that the
"timing" problem was caused by OHA delaying from December 22,
1987 when Lubrizol filed its claim until August 12, 2004 to file
its initial decision granting the Lubrizol award.

OHA concluded that Lubrizol was an end-user entitled to a
presumption of injury because it was not a reseller, because "by
adding chemicals to the petroleum products it purchased from
refineries, (Lubrizol) substantially changed the form of the
petroleum products it purchased." For that finding, OHA evidently
relied on Lubrizol's statement that because the base oils were
added to chemicals "oil is an integral part of their (the
'additive packages' produced by Lubrizol) manufacture."

Indeed, OHA's explanation that the "additive packages were
then sold (by Lubrizol) not as petroleum products themselves but
as a product which when added to a purchaser's oil would produce
a change in the physical and chemical properties of the
purchaser's oil" might well have led not only to double counting,
but to triple counting, i.e. the ability of three separate
claimants to assert the right to crude oil refunds on the same
gallon of base oils. Lubrizol would be entitled to claim on the
gallon of base oil which it added to its chemicals to make the
"additive package." The purchaser from Lubrizol, if a refiner or

18

reseller of oil products, would be entitled to claim on the basis of the gallon of base oil included in the "additive package" purchased frm Lubrizol (as well as on the basis of the oil into which it mixed the additive package) because the "resulting change in the physical and chemical properties of the purchaser's oil" would make it, too, an end-user. And, finally the true end user to whom the oil with additives was sold and who used it, e.g. to power an engine, would be entitled to crude oil refunds on the basis of the same included gallon of base oil.

<u>ARGUMENT</u>

I  <u>DESPITE OHA'S ATTEMPT TO DISGUISE THE FACT, ITS LUBRIZOL</u>
<u>DECISION CONSTITUTES AN ENDORSEMENT OF THE 'DOUBLE COUNTING OF</u>
<u>PETROLEUM PRODUCT GALLONS FOR REFUND PURCHASES" IN VIOLATION OF</u>
<u>THE FUNDAMENTAL PRINCIPLE OF "ONE GALLON-ONE CLAIM"</u>

OHA's decision demonstrates a recognition of the significance of awarding crude oil refunds on gallons purchased by Lubrizol where the very same gallons may be claimed again as the basis for crude oil refunds by a downstream end user purchaser, a result which OHA itself characterizes as "double counting of petroleum product gallons for refund purchases."

Obviously aware that such "double counting" would violate the principle of one-gallon one refund which is at the heart of OHA's formula for crude oil refund distribution, OHA argues that

there is "not sufficient evidence" for it to conclude that a "significant" portion of the base oils purchased by Lubrizol became part of an oil product purchased by downstream end users. Indeed, it characterizes as "too speculative" the Utilities and Manufacturers' argument that such double counting is likely given the fact that much, if not most or indeed all of the additive packages sold by Lubrizol (which contain the base oils for which Lubrizol is being awarded crude oil refunds) were, as Lubrizol explained, sold to "major domestic oil companies" which then blend the additive packages with "other oils... to make a finished lubricant product." (Administrative Record, p. 712).

OHA's attempt to eliminate the "double counting" argument by Utilities and Manufacturers is doubly significant:

1. OHA's finding it necessary to find a lack of sufficient evidential support for the "double counting" argument constitutes an acknowledgment that if the evidence demonstrated a significant amount of potential double counting, with a downstream end user able to obtain crude oil refunds on the basis of the volume of base oils for which Lubrizol was claiming crude oil refunds, an award to Lubrizol for "base oil" purchases would be improper.

Had OHA not understood the impropriety of "double counting" it would not have found it necessary to comment on the sufficiency of the evidence. It would have instead merely said that an award on the base oils mixed with its chemicals by

20

Lubrizol was appropriate even if the same volume of base oils later became the basis of a crude oil refund by the end user who purchased from Lubrizol's oil industry customer.

2. The insufficiency of the evidence is not the fault of Utilities and Manufacturers, but rather the fault of Lubrizol and OHA.

Lubrizol was given multiple opportunities to identify the customers to whom it sold its additive packages containing the base oils and/or to provide information as to what percentage of the additive packages were sold to refiners or others in the oil industry such as resellers of petroleum products and therefore likely to become subject to a claim for crude oil refunds by a downstream end user. Lubrizol never supplied the information.

Nor did OHA ever request Lubrizol to supply such information even though earlier in the proceedings OHA had at least tentatively identified Lubrizol as a possible reseller, and was certainly aware from the nature of Lubrizol's products that it was likely that there were downstream end users who could have claimed crude oil refunds on the basis of the same volume of base oils claimed as the basis of crude oil refunds by Lubrizol.

Although Utilities and Manufacturers raised the issue, inviting Lubrizol to provide the necessary information as to its customers in order to refute the implication that most, if not all, of the base oils were subject to claims as the basis for

21

crude oil refunds by end users as part of a volume of lubricating oils or gasoline or diesel fuel etc., Utilities and Manufacturers neither had the information, nor the availability of any procedure to find the information; OHA neither made available a discovery procedure nor a hearing in which such information could have been developed by Utilities and Manufacturers.

The history of the proceedings demonstrates a consistent determination by Lubrizol not to supply the information which would reveal the extent of the "double counting" which might have occurred as to the base oils, i.e. that there was a downstream end user who could claim refunds on the same volume of base oils.


II    THE INFORMATION PROVIDED BY LUBRIZOL DEMONSTRATES THAT IT WAS A "RESELLER" AS TO THE BASE OILS, i.e. THAT THERE WAS A DOWNSTREAM END USER; ITS, AND DOE'S, ATTEMPTS TO AVOID SO RECOGNIZING ARE OF NO AVAIL

In its response to Utilities and Manufacturers' Objections, Lubrizol explained that it sells its "additive packages" containing the base oil to customers who "blend that package with oil that they made or purchased from a refiner or resellers," to produce what Lubrizol describes as "fully formulated lubricant." (Schroeck Affidavit, at 7-8) (Administrative Record, p. 529-530).

Lubrizol had previously acknowledged that among its "significant" customers are "divisions and affiliates of major

22

domestic oil companies." (Affidavit of Lucy M. Miller, Attachment B to submission of September 19, 1988) (Administrative Record, p. 65).

Moreover, and most importantly, it would seem clear that a significant, indeed a substantial, amount of the "additive package" product finds its way into engine oils, gasoline and diesel fuels after Lubrizol's customers add additional oil ("customer base stock") to make "fully formulated lubricants." (AS  materials obtained on the Lubrizol website explain, "Our customers include the world's largest oil marketers and we're the recognized leader in specialty additive systems for lubricating oils used in gasoline and diesel engines, automatic transmissions, gear drives, marine engines and tractors., and "The Lubrizol Corporation...is a global provider of specialty chemicals and materials for a wide variety of markets and end-use applications such as lubricant additives for engine oils, other transportation-related fluids , as well as fuel additives for gasoline and diesel fuel. " (emphasis supplied) ( Exhibit A and B to Reply submitted at Administrative Record, p. 662).

The base oil gallons on the basis of which Lubrizol claims crude oil refunds thus are part of gallons of refined petroleum product ultimately purchased and used by end users, in automobiles, trucks, tractors, industrial machines etc.

OHA has granted crude oil refunds to hundreds, indeed

23

probably thousands, of purchasers of the lubricating oils which
Lubrizol sold, presumably in most instances through resellers, on
the basis of the lubricating oils which Lubrizol sold, and which
were used either directly or after incorporation in other oil
products in transportation, industry and agriculture, e.g.
products such as "engine oils, automotive transmission fluids,
gear lubricants, industrial fluids, metalworking compounds and
gasoline and diesel fuels" which Lubrizol has identified as the
principal users of its additives. (Lubrizol submission of July 2,
1992 (Administrative Record, p. 88-89); see also the Lubrizol
1977 Annual report showing that some 66% of its sales were for
products used in transportation, 15%  construction and mining, 7%
farming, and 12% industrial) (Administrative Record, p. 140).

As Lubrizol explained in its July 2, 1992 submission, the
base oils on the basis of which it has been awarded crude oil
refunds are properly described as "carrying agents" because they
are used as "diluents for chemicals, that would otherwise be too
thick to handle conveniently. Additives are made in liquid form,
using oils, for ease of incorporation into the customer's
product. In essence these oils 'carry' the additive chemicals--
thus they are referred to as 'carrying agents.'" (Administrative
Record, p. 89).

If the lubricating oil products which Lubrizol produces or
the oil products (e.g. motor oils , gasoline and diesel fuel)

24

into which Lubrizol's products are placed by another entity in the petroleum industry, are properly the basis for a claim for crude oil refunds by the end user of such products, then to treat Lubrizol as an end user of the base oils which it uses as carrying agents would result in two end users of the same base oil volumes.

Accordingly, it would seem clear that inasmuch as there are end users downstream of Lubrizol who can assert, and in many cases probably have successfully asserted, that they are the end users of the base oils which are incorporated in Lubrizol's products, Lubrizol must be treated as a reseller, not as an end users vis-a-vis such base oils. Otherwise, the basic assumption upon which the calculation of the crude oil volumetric (by dividing the refunds by the volume of end use during the regulatory period) is based, i.e. that there is only one end user as to each gallon of refined product, would be rendered false.

As a reseller, as explained by OHA in its August 9, 1994 letter to Lubrizol, in order to recover crude oil refunds, Lubrizol would be required to "make a detailed showing of injury." As there explained by OHA, "a showing of reduced profit margin is insufficient to make a detailed showing of injury." By so advising Lubrizol, OHA was necessarily concluding that the previous Lubrizol submission, in response to the States' objections, by Affidavit of Lucy M. Miller as to the narrowing of

profit margin, was insufficient to establish injury. (Administrative Record, p. 163)

OHA has articulated two bases for its conclusion that Lubrizol was an end user of the purchased base oils, and not a reseller, even though there would inevitably be an end user who could claim crude oil refunds on the same volume of base oils on the basis of which Lubrizol claimed crude oil

1. First, based on a Lubrizol argument, OHA held in its initial decision of August 12, 2004 awarding crude oil refunds to Lubrizol that Lubrizol was entitled to end user status because its products contained less than 50% of base oils., ( See Lubrizol memorandum of December 18, 2003 from Cal Schroeck, Administrative Record, p. 223); the calculation contained in the memorandum is hardly convincing given its use of averages and estimates, its acknowledgment that it could not compute a weighted average, and its acknowledgment that in some products the oil content was as much as 56%. Moreover, in its August 14, 1996 submission, Lubrizol acknowledged that "Lubrizol's products range from 10 to 90 percent base oil versus additive package", and that in its crankcase additives which "were Lubrizol's largest volume product" during the 1973 to 1981 period, the "percentage of base oil content in the five products produced in the largest volumes at Lubrizol's largest domestic production facility" ranged from 43% to 60%, with two of the five being

26

above 50%, with no information provided as to the relative volumes of each of the five products (Administrative Record, p. 169-72).

The basis on which OHA accepted the argument that if acquired base oils represented less than 50% of the volume of the product sold by Lubrizol it was entitled to crude oil refunds, as reflected in the OHA Decision and Order of August 12, 2004, is evidently the fact that products containing less than 50% petroleum product were not considered to be "covered product" subject to price regulation.

Such an argument is unconvincing for two reasons:

(i) In the first place, as noted above, at least some substantial amount of Lubrizol's products contained more than 50% in volume of base oils, and such products would be "covered"; OHA's Decision recognizes that fact by observing that "the <u>majority</u> of Lubrizol's product by volume contain less than 50% petroleum products (emphasis supplied)." Thus, even if products containing less than 50% base oils qualified for crude oil refunds even if the claim was made by a reseller, there is admittedly a <u>minority</u> of the base oils, perhaps as much as 49%, which would not be the basis of refunds because they represented more than 50% by volume of the product produced and sold by the reseller. Accordingly, one-half of the Lubrizol claim on the bases of purchase of base oils should be disqualified as the

27

basis for crude oil refunds.

(ii) In the second place, and far more importantly, it is irrelevant whether the product produced by a refiner or reseller is "covered product" subject to price regulation. The injury passed through by producer overcharges in crude oil was not restricted to "covered product", and indeed in administering the crude oil refund program, OHA has never made recovery dependent on whether the product purchased by the end user was or was not a "covered product"; indeed for most of the regulatory period much of the refined product sold to end users was not price regulated, but nevertheless has been the basis for crude oil refunds. In the study performed by OHA at the request of the <u>Stripper Well</u> Court, OHA recognized that injury by virtue of crude oil overcharges was not dependent on the regulated price of refined products; rather, by virtue of the Entitlements Program, crude oil overcharges were, but for minor absorption at the refiner and reseller level, passed through on <u>all products</u> of refiners, without regard to whether the refiner product was price regulated.

Faced with such submission by Utilities and Manufacturers, in its subsequent "Supplemental Order" of June 27, 2005 rejecting the Utilities and Manufacturers' challenge to the Lubrizol award, OHA presumably abandoned the "covered product" argument as the basis for holding that Lubrizol was not a reseller; there is no mention of the argument in the Supplemental Order.

28

2. The second basis advanced by OHA for holding that
Lubrizol was an end user of the base oils and therefore entitled
to a presumption of injury and not a reseller who had failed to
provide the required proof of injury is based on the definition
of "reseller" in the price control regulations, i.e. that a
reseller is a firm in the business of purchasing covered products
and reselling them "without substantially changing their form to
purchasers other than ultimate consumers." 10 C.F.R. Sec.212.31.

In its initial award decision of August 12, 2004, OHA found
that "Lubrizol has shown that the additives and processes it uses
to convert the petroleum products (i.e. the base oils) to
specialty chemicals substantially change the nature of the
petroleum products themselves. Consequently, Lubrizol is an end-
user and not a reseller of petroleum products." (Administrative
Record, p. 227).

In its "Supplemental Order" rejecting the Utilities and
Manufacturers' challenge to the Lubrizol award, OHA reiterated
the argument, explaining that "OHA made an explicit finding that,
in creating the specialty chemicals using the purchased petroleum
products, Lubrizol had substantially changed the form of the
petroleum products." (Administrative Record, p. 708).

OHA misses the point.

The determination of who is a reseller for purposes of
determining whether the firm is subject to price regulation is

29

not determinative of whether a firm is a reseller, i.e. not an end user, in its capacity as a claimant for crude oil refunds.

Thus, as to the issue of whether Lubrizol is subject to price regulation in its sale of its additive packages, DOE may well have determined it was not a reseller and therefore not subject to price regulation.

However, for purposes of the crude oil refund proceedings, a "reseller" is one who is selling a petroleum product, and an end user is one who either consumes the petroleum product or converts it into a non-petroleum product. It is irrelevant whether the petroleum product sold by the reseller is in the same form in which it was purchased or has been "substantially changed" into another petroleum product.

The issue is whether the crude oil refund claimant has sold a product which is a petroleum product, whether it be changed or unchanged. If it is a petroleum product which the claimant has sold, then its volume, including any incorporated petroleum product purchased by the claimant, is the possible, indeed probable, basis for an end user claim.

And if the same volume (of base oils) can be claimed by two claimants, then the assumption on the basis of which the per gallon entitlement has been calculated is rendered an incorrect assumption.

The inescapable fact is that if DOE had contemplated that

two claimants could both recover for the same volumes, it would not have adopted a formula which assumed the contrary, i.e. that for each gallon of end use there could be only one claimant.

Indeed, the definition of who is a "reseller", i.e. not an end user, for purposes of crude oil refunds is contained not in the definition of who is a reseller for price regulation purposes but is implicit in the adoption of a formula for distribution of crude oil refunds which calculates the per gallon entitlement, the volumetric, by dividing the refunds recovered by DOE and available for distribution by the volume of <u>end use</u> of petroleum product. Such a formula, DOE's policy that only an end user is entitled to a presumption of injury, and that those upstream (refiners, resellers and retailers) are required to prove actual injury through absorption of overcharges, means that a firm such as Lubrizol is a "reseller" for purposes of crude oil refund claims, regardless of whether it is a reseller for purposes of price regulation.

Moreover, and finally, there is yet another reason why in a situation where there are two or more potential claimants at different levels of distribution to crude oil refunds on the same volume of base oils, it is the upstream claimant who must be required to demonstrate absorption of the overcharges reflected in the price of the petroleum product purchased. In processing an end user claim for a product such as crankcase oil, gasoline or

31

fuel oil, there is no way of determining whether the volume
claimed includes petroleum products as to which an upstream
claimant has made, or can make, a claim. Thus, for example, in
processing a manufacturer's claim for refunds on the basis of
gasoline purchases, there is no way for DOE to be able to
determine that the gasoline volume includes a volume of base oils
which Lubrizol added as diluents to its chemicals and which found
their way into gasoline as a finished lubricant produced by
Lubrizol's customer and then mixed with gasoline either by that
customer or by the customer's customer.

In such a situation, the only way to avoid "double
counting", i.e. having two or more refund claims on the basis of
the same volume of base oils, is to impose upon the upstream
claimant the burden of demonstrating absorption. Inasmuch as it
is unlikely that the upstream claimant can carry that burden,
dilution of the volumetric by two claims on the basis of the same
volumes is avoided.

III    BY AWARDING REFUNDS TO LUBRIZOL ON THE BASIS OF VOLUMES
WHICH COULD ALSO BE CLAIMED BY A DOWNSTREAM END USER, OHA HAS
VIOLATED THE ESSENTIAL PRINCIPLES WHICH IT ESTABLISHED AND WHICH
IT HAS CONSISTENTLY APPLIED

In establishing the formula for distribution of crude oil
refunds, thereby initiating the claims process, DOE explained

that only end users would be entitled to a presumption of injury, i.e. would not be required to demonstrate their inability to pass through in the non-petroleum products they sold any injury suffered by virtue of overcharges reflected in the price of petroleum products which they had purchased. It defined end users as "(ultimate consumers) whose businesses are unrelated to the petroleum industry." Implementation of Special Refund Procedures, 52 Federal Register 11,737, at 11,742 (April 10, 1987). OHA announced that, in contrast, "a reseller or retailer must submit additional evidence to show they were injured in crude oil refund cases. Under the circumstances, resellers and retailers will not be permitted to use presumptions to show they were injured in crude oil refund cases." id.

Because of, and consistent with, OHA's contemplation that no applicant was likely to be able to bear the burden of proving injury and therefore only those entitled to a presumption of injury, i.e. "(ultimate consumers) whose businesses ware unrelated to the petroleum industry", would be entitled to crude oil refunds, OHA promulgated the formula to be used–- i.e. dividing the recovered crude oil refunds by the total of all petroleum products "consumed in the United States" during the regulatory period. Id, at 11,740.

OHA incorrectly cites as supporting its award to Lubrizol its rejection in a footnote in its April 1987 "Implementation" of

33

an adjustment to its formula which had been proposed by a commenter. The proposal was to eliminate from the denominator (the volume of petroleum products consumed in the United States by all those not in a petroleum related business) the volume of purchases by those who had recovered funds in the <u>Stripper Well</u> settlement, because such end users would not be entitled to recover from the DOE-recovered funds. Had such an adjustment been accepted, it would have increased the per gallon amount to be distributed to those successfully claiming in the DOE crude oil claims process. Such is the reverse of the effect of awarding refunds here to Lubrizol on the basis of the same volume of purchases which are also subject to a claim by ultimate end users; the procedure here decreases rather than increases the award to end users.

Nor does the language used by OHA in rejecting that commenters proposal support the award to a firm which is in the petroleum business such as Lubrizol and which is therefore not an end user as that term was understood by OHA. The language in the footnote in the April, 1987 Implementation Order quoted by OHA in rejecting the Utilities and Manufacturers' challenge here is that "all of the volumes that passed through petroleum product resellers and retailers were ultimately consumed by end-users, some of whom may apply for themselves, and this could produce double or triple counting of volumes." Such a comment is relevant

34

to the rejection of the adjustment which had been proposed only
to the extent to which it suggests that the possible need to use
some refunds for award to resellers who could prove absorption
provided a reason for the reduction of awards to end users which
was effected by including in the denominator volumes for which
claims could not be made by end users because they had waived
such a right in recovering in Stripper Well.

After its adoption of the formula and its restriction of the
presumption of injury to end users consuming petroleum products
or converting them to non-petroleum products, OHA steadfastly
observed-- until the Lubrizol award--  its requirement that those
reselling petroleum products prove absorption. To the best of
Utilities and Manufacturers no one has provided such proof, and
no reseller has obtained crude oil refunds.

Indeed, when five years after adopting the formula assuming
refunds would be made only to ultimate end users, OHA determined
to make awards to ultimate consumers on the basis of any product
named as a covered product pursuant to the Emergency Petroleum
Allocation Act ("EPAA") even though the product might have been
produced other than from crude oil, it expressed concern about
the reduction such might cause in awards to end users claiming on
the basis of product refined from crude oil. Notice of General
Interest Concerning DOE's Crude Oil Overcharge Refund Program, 57
Federal Register 30,731 at 30,732 (July 10, 1992). In doing so,

35

OHA recognized the significance of the fact that its formula was based on ultimate end use consumption, and that the formula contemplated that the recovered crude oil refunds would be awarded only to such ultimate end users.

IV   THE FACT THAT OHA HAS ANNOUNCED PROCEDURES FOR A FINAL DISTRIBUTION PROVIDES NO BASIS FOR RELIEVING LUBRIZOL OF THE BURDEN OF REVEALING TO WHAT EXTENT ITS PRODUCTS AND THE INCLUDED BASE OILS WERE SUBJECT TO A REFUND CLAIM BY A DOWNSTREAM END USER

In its June 27, 2005 decision rejecting the Utilities and Manufacturers' challenge to the Lubrizol award, OHA gives as an additional reason the fact that the impending "final" distribution of crude oil refunds makes it inappropriate for it to "now insist that Lubrizol be forced to provide additional specific data concerning to whom it sold its products and how they were used by the purchaser in order that a further analysis concerning potential double counted gallonage could be made."

In fact, Lubrizol was put on notice that it might properly be considered to be a reseller almost eleven years earlier, ten years before OHA 's initial decision making the award to Lubrizol. By letter dated August 9, 1994, OHA explained that if deemed not to be an end user entitled to a presumption of injury, but rather a reseller Lubrizol would be required to "make a detailed showing of injury."

36

Lubrizol never provided such in the ten years from the date of that letter until the initial award decision of August 12, 2004.

Nor did Lubrizol provide such information in the 3 months after its specific need was pointed out by Utilities and Manufacturers in their March 23, 2005 Objections.

Lubrizol did respond to the Utilities and Manufacturers' Objections with an extensive submission, but it did not include the critical information which would enable OHA to make an analysis of the extent of "double counting", even though Lubrizol understood that such was the gravamen of the Utilities and Manufacturers' Objections. From such a failure to produce the requested material, it can only be properly assumed that the requested facts would demonstrate that most, if not all, of the Lubrizol product was sold to others in the petroleum industry and/or as a petroleum product, so that the volume of the base oils Lubrizol purchased were part of volumes subject to a crude oil refund claim by downstream end users, i.e. subject to double counting.

Moreover, in any event, OHA's failure to insist on the requested material providing the basis for determining the extent of the risk of double counting can only be construed as a holding by OHA that even if each and every gallon of base oils for which Lubrizol was being awarded crude oil refunds was subject to one

and perhaps more than one crude oil refund claim downstream, such
would be appropriate.

CONCLUSION

OHA's award to the Lubrizol Corporation on the basis of its
purchase of 335.6 million gallons of "various base oils" is in
violation of the central principle which has informed the
adjudication of more than 100,000 claims, i.e. that the award of
crude oil refunds on the basis of a presumption of injury can be
made only to end users consuming petroleum products or converting
them into non-petroleum products which are not subject to a
further claim for crude oil refunds by a subsequent purchaser.

Accordingly, such an award is not supported by the requisite
substantial evidence nor is it rational.

Summary Judgment should be entered reversing and vacating
the award to Lubrizol and remanding the matter to OHA for the
elimination of any award to Lubrizol based on its purchases of
the "various base oils."

Respectfully submitted,

_____

Philip P. Kalodner
208 Righters Mill Road
Gladwyne PA 19035
DC Bar 973578

December 9, 2005          Attorney for Plaintiffs

38