# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Consolidated Edison Company of New York, Inc.,** *et al.,* | ) ) ) |
| **Plaintiffs,** | ) ) |
| v. | )  Civil Action No. 1:05CV01467-RWR ) ) |
| **Spencer Abraham, Secretary of Energy,** *et al.,* | ) ) |
| **Defendants.** | ) |

### FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF
### THEIR MOTION TO DISMISS OR IN THE ALTERNATIVE
### FOR SUMMARY JUDGMENT JUDGEMENT

### INTRODUCTION

Plaintiffs have brought this action challenging a crude oil refund award by the Office of Hearings and Appeals ("OHA") of the Department of Energy ("DOE") to Lubrizol Corporation ("Lubrizol") as a beneficiary of the crude oil overcharge restitution regulations. *Lubrizol Incorporated*, June 27, 2005 (Administrative Record ("AR") at 707)[1]. However, OHA's decision is based on undisputed evidence and sworn submissions before it in the refund proceeding. OHA's decision evaluating the record before it was reasonable and an appropriate exercise of its discretion in administering the refund program. Accordingly, this court should sustain OHA's decision.

---

[1] This decision may also be found on the world wide web at the following address: "http://www.oha.doe.gov/cases/refunds/2005/June/rc27200438.htm"

**STATEMENT**

The Emergency Petroleum Allocation Act of 1973 (EPAA), 15 U.S.C. 751 *et seq.* (1982), which incorporated by reference portions of the Economic Stabilization Act of 1970 (ESA), 12 U.S.C. 1904 note (1976), required the President to promulgate regulations providing for the mandatory allocation of crude oil, in amounts and at prices specified in the regulations. The President's authority under those statutes expired in 1981. Energy Policy and Conservation Act (EPCA), Pub. L. No. 94-163, Section 461, 89 Stat. 955. A savings provision, however, preserved enforcement proceedings based on acts committed or liability incurred prior to the expiration date. *Ibid*.

Section 209 of the ESA authorized the Government to obtain "restitution of moneys received in violation" of DOE's price controls. Economic Stabilization Act Amendments of 1971, Section 209, Pub. L. No. 92-210, 85 Stat. 743 (1971). Section 210 of the ESA provided a separate private cause of action for persons to recover money damages (including treble damages) for violations of the price control regulations. *Ibid*.

DOE's public enforcement program recovered a large amount of crude oil overcharges. In the past, DOE employed a wide variety of remedies pursuant to its enforcement powers, such as compelling restitution by means of refunds to first purchasers, ***Midwest Petroleum Co. v. Department of Energy***, 760 F.2d 287 (Temp. Emerg. Ct. App. 1985); restitution by means of payments to the United States Treasury, ***Payne 22, Inc. v. United States***, 762 F.2d 91, 94 (Temp. Emerg. Ct App. 1985); restitution by means of payments in kind to the Strategic Petroleum Reserve, ***Champlin Oil Co.***, 47 Fed. Reg. 49703 (Nov. 2, 1982); and restitution by means of payments to state energy programs, ***United States v. Exxon***, 773 F.2d 1240 (Temp. Emerg. Ct

App. 1985), *cert. denied*, 474 U.S. 1105 (1986); see also ***Standard Oil Company*** (Ohio), 47 Fed. Reg. 49705 (November 2, 1982); ***Standard Oil of California (Chevron)***, 46 Fed. Reg. 52221 (October 26, 1981).

However, pursuant to a 1986 settlement agreement in ***In Re the Department of Energy Stripper Well Exemption Litigation***, 653 F. Supp. 108, 113 (D. Kan. 1986), DOE adopted a restitutionary policy for cases involving crude oil overcharges. By the agreement, DOE resolved on a uniform basis the restitutionary issues for all crude oil overcharge recoveries obtained by DOE pursuant to its former oil price control enforcement authority under ESA Section 209. For claimants who were parties to the ***Stripper Well*** settlement, the agreement established a mechanism, through individual escrow accounts, for various groups -- including refiners, resellers of refined petroleum products, retailers of gasoline and diesel fuel, agricultural cooperatives, domestic airlines, investor-owned utilities, surface transporters, and rail and water transporters -- to receive a portion of the funds from a ***Stripper Well*** escrow. In return, these parties were required to waive all existing and future claims to any other crude oil overcharges recovered by DOE. ***In Re DOE Stripper Well Exemption Litigation***, 653 F. Supp. at 112.

With respect to crude oil claims by non-parties to the ***Stripper Well*** settlement, such as plaintiffs and claimant Lubrizol, DOE agreed to issue a Modified Statement of Restitutionary Policy providing an opportunity for victims of overcharges to submit claims in refund proceedings pursuant to the agency's Subpart V procedures. See 10 C.F.R. Part 205. To pay such claims, the agreement authorized OHA to reserve initially up to 20 percent of all crude oil overcharge funds in the agency's escrow. The remaining 80 percent, and any funds not otherwise distributed to claimants, are to be divided equally between the states (for use in

specified energy-related programs) and the federal government as a form of indirect restitution. See Settlement Agreement, IV B, 2, 3, 6, *reprinted in* 7 *Energy Management* ¶ 90,509. Such indirect restitution is required in crude oil overcharge cases because, under DOE's former Entitlements Program, the cost of all crude oil, including overcharges, was effectively spread among all refiners and ultimately to all purchasers in the United States. See ***United States v. Exxon Corp.***, 773 F.2d 1240, 1274, 1280-1286 (Temp. Emerg. Ct. App. 1985), *cert. denied*, 474 U.S. 1105 (1986); ***In re Seneca Oil Co.***, 906 F.2d 1445, 1446 (10th Cir. 1990).

DOE implemented the ***Stripper Well*** settlement by issuing the required Modified Statement of Restitutionary Policy For Crude Oil Cases, 51 Fed. Reg. 27899 (August 4, 1986) (the "MSRP"), and announcing its intention to follow the MSRP in crude oil refund proceedings under Subpart V. OHA solicited comments concerning the appropriate procedures to be employed in such cases, 51 Fed. Reg. 29689 (August 20, 1986), and subsequently issued a "Notice Explaining Procedures for Processing Refund Applications in Crude Oil Refund Proceedings Under 10 C.F.R. Part 206, Subpart V," 52 Fed. Reg. 11737 (April 10, 1987). ("1987 OHA Notice"). [2]

The 1987 notice implementing the policy agreed upon in ***Stripper Well*** provides for a "rolling" refund process in which moneys flow in and out of the reserve fund as overcharge settlements are collected and refund claims are processed. 82 Fed. Reg. at 11,739. The DOE

---

[2] In 1986, shortly after the ***Stripper Well*** settlement agreement was approved, Congress enacted the Petroleum Overcharge Distribution and Restitution Act ("PODRA"), 15 U.S.C. §§ 4501-4507 (1988). The PODRA governs all funds collected by the DOE pursuant to its responsibilities under Section 209 of the ESA, *except* crude oil refunds, which are governed by the ***Stripper Well*** settlement agreement. Thus, the PODRA does not apply to "any amount to which any person or class of persons has an enforceable right * * * governed by the terms and conditions of the settlement approved on July 7, 1986, in ***In Re: the Department of Energy Stripper Well Exemption Litigation***, M.D.L. No. 378, in the United States District Court for the District of Kansas * * *."15 U.S.C. §§ 4501(c) (1988).

recovers overcharges in enforcement actions and sets aside 20 percent of those funds as an account for future individual claims. The remaining portion is distributed to the States and the federal treasury for indirect restitution. *Id*. at 11,737. Parties who purchased crude oil products during the price control years may file overcharge claims. DOE determines whether a claim has merit and the amount of eligible product purchased by a party. DOE then refunds to successful claimants a certain amount of money per gallon of eligible product purchased. Id. at 11,738-11,740.

The earliest formulations of a rule governing the eligibility of products for which a purchaser could make a "Subpart V" refund claim included all products that were regulated pursuant to regulations promulgated under Phase IV by the Cost of Living Council ("CLC"). In 1992 the OHA reevaluated these standards and after notice and comment promulgated a new policy specifying the items for which a "Subpart V" claim could be validly lodged. It said in that notice that:

> We will treat all products covered by the EPAA as having been produced at a crude oil refinery. Products not covered by the EPAA will be treated differently. It will be the burden of the applicant to establish that a product not within the definition of covered products under the EPAA was in fact produced at a crude oil refinery See, definition of "covered products" at 40 FR 2795 [January 16, 1975].

***Notice of General Interest Concerning DOE's Crude Oil Refund Program***, 57 *Fed. Reg.* 30731 at 30732 (July 10, 1992). ("***Notice of General Interest***")

DOE calculates the amount refunded per gallon according to the "volumetric method," i.e., by dividing the total crude oil overcharge moneys currently available by the total U.S. consumption of petroleum products while price controls were in effect. 52 Fed. Reg. at 11,740. DOE considered various alternative methods of setting the numerator in the volumetric

5

calculation, and initially settled on a calculation of $0.0002 per gallon.  That amount is periodically readjusted in response to the overcharge funds the DOE collects.  It is currently set at $0.0016.  *See* ***Notice of Issuance of Interim Supplemental Refund Checks in the Crude Oil Overcharge Special Refund Proceeding***. 60 *Fed. Reg.* 15,562 (1995).  As of 2003 OHA had granted approximately 86,000 refunds under the crude oil program. (68 Fed. Reg. 64098 , 64099 (November 12, 2003)).

As more moneys are collected, claimants automatically receive a share of the funds. Under ***Stripper Well*** any funds remaining after all refund moneys have been collected and all potential claims have been processed would be distributed to the States and federal government 52 Fed. Reg. at 11,740-11,741.  See ***Consolidated Edison Co. v. Herrington***, 752 F.Supp. 1082, 1083 (D. D.C. 1990), *aff'd*, 927 F.2d 1227 (Temp. Emer. Ct. App. 1991).

Plaintiffs, a group of utilities and pulp and paper companies, have filed a number of lawsuits over the past 11 years in an effort to obtain a larger share of crude oil overcharge moneys.  See, e.g. ***Consolidated Edison Co. v. O'Leary***, 4 Energy Mgnt. (CCH) ¶ 26,714 (Fed Cir. 1997); ***Consolidated Edison Co. v. O'Leary***, 4 Energy Mgnt. (CCH) ¶ 26,693 (D.D.C. 1995); ***Herrington***, 752 F. Supp. at 1085-1086; ***Getty Oil Co, v. Department of Energy***. 865 F.2d 270 (Temp. Emer. Ct. App. 1988).  The instant case in which the plaintiffs challenge OHA's refund award to Lubrizol follows prior cases in which  plaintiffs unsuccesfully challenged refunds to other Subpart V claimants.  ***Consolidated Edison Co. of New York, Inc. v. Abraham,*** Energy Management (CCH) ¶ 26,757 (D.  D.C.  March 28, 2005); ***Consolidated Edison Co. of New York, Inc. v. Peña,*** Energy Management (CCH) ¶ 26,752 (D.  D.C.  July 21, 2004); ***Consolidated Edison Co. of New York, Inc. v. Abraham***, Energy Management (CCH) ¶

6

26,750 (D. D.C. October 16, 2002), *aff'd.* Dkt. # 03-1207 , Fed. Cir., 71 Fed. Appx. 852; Energy Management (CCH) ¶ 26,751 August 12, 2003.

In this instance Lubrizol applied for a refund and was granted an award of $557,736[3] in 2004. ***Lubrizol Corporation,*** "http://www.oha.doe.gov/cases/refunds/2004/August/-rf27220947.htm." In that decision OHA found that:

> Lubrizol is a speciality chemical company that makes a large number of products. Lubrizol has shown that the additives and processes it uses to convert petroleum products to speciality chemicals substantially change the nature of the petroleum products themselves. Consequently, Lubrizol is an end-user and not a reseller of petroleum products.

Slip Op. at 1.

That decision was appealed to the United States District Court for the District of Columbia (***Consolidated Edison v. Abraham***, Dkt. # 1:04CV01732-EMS). This matter was later, on unopposed motion, remanded to the agency for further consideration. (Minute order of November 26, 2004).

Upon remand the OHA made further inquiry and afforded plaintiffs a full opportunity to participate in the administrative proceeding. Lubrizol furnished two supporting affidavits explaining: (1) the sources of the petroleum products utilized in their manufacturing process and (2) the nature of the nature, content and uses of products produced by Lubrizol. (Schroeck May 13 Affidavit, AR-523). Plaintiffs filed comments in response to these submissions. Those

---

[3] The refund granted in this Decision is $557,736 (348,585,189 gallons x $0.0016 per gallon).

comments sought to raise questions and create doubt about the merits of Lubrizol's application. Each of these concerns were addressed in turn by the final decision and order. (AR-709-713).

In its supplemental decision upholding a refund award to Lubrizol, OHA fully addressed the four basic objections plaintiffs raised concerning Lubrizol's eligibility for a crude oil refund. First, OHA addressed plaintiffs' raising of the possibility that Lubrizol's petroleum purchases were from outside the United States and thus ineligible for a crude oil refunds since foreign purchases were not subject to the petroleum price regulations. See OHA Supplemental Order at 3, citing *Christian Haaland A/S,* 19 DOE ¶ 85,191 (1989) (AR-709). In response OHA pointed to one of the sworn affidavits submitted by Calvin Schroeck, a chemical engineer employed by Lubrizol. OHA stated:

> In the *May 13* [2005] *Affidavit,* Dr. Schroeck states that he has reviewed the schedule of purchases that Lubrizol submitted to OHA. By reviewing the product identifying codes associated with each product in the submitted schedule and the available records and purchasing specification sheets for the products at Lubrizol, he stated he can certify that the source of all of the claimed products were refineries located in the United States. *See May 13 Affidavit* at ¶¶ 11-14. Lubrizol has also submitted the specification sheets for each of the oil products for which it has requested a refund.

AR-709.

Second, OHA addressed the plaintiffs' concern that there was insufficient evidence to support Lubrizol's claim that each of the claimed petroleum products in Lubrizol's application is in fact a product eligible for a refund in the crude oil proceeding. OHA addressed this issue, stating:

> In their submissions concerning the Lubrizol application for refund, the Utilities point out that Lubrizol has not provided OHA with any documentation such as invoices or contemporaneous purchase records identifying the source of the petroleum products Lubrizol purchased. *Objections* at 1 6. Responding to the Utilities' objection, Dr. Schroeck, in the *May 13* Affidavit, examined the purchase

> schedule submitted for Lubrizol's claim and has certified that each of the petroleum products claimed was in fact purchased at refineries in the United States. Dr. Schroeck further states in the affidavit that the descriptions on the specification sheets indicate the products were obtained at refineries. For example, Dr. Schroeck states the composition of one of the products as listed on the product's specification sheet, "conventionally refined, solvent extracted, MEK dewaxed, hydrofinished paraffin oil from Mid-Continent crude," describes the refining process that was used to create the particular petroleum product and thus provides additional evidence that the product was obtained directly from a refinery. *May 13 Affidavit* at 1 15. Further, our examination of the corresponding specification sheets for each product indicates that the products were purchased from oil companies and not petrochemical firms. In view of the evidence that these products were obtained from a refinery, we affirm our conclusion that each of the products listed on Lubrizol's purchase schedule (excluding the solvents specifically determined to be ineligible in *Lubrizol)* qualifies as an eligible product in the crude oil refund proceeding.

AR-710.

Third, plaintiffs raised the issue whether Lubrizol should be considered an ineligible "reseller" rather than an eligible "end-user" under the refund program . (Resellers are generally presumed by OHA to have passed the impact of the overcharges on to their customers while end-users are presumed to have absorbed the overcharge, thus accounting for their different eligibility treatment. See Supplemental Order at 4-5 (AR-709-710); OHA 1987 Notice, 6 Fed. Energy Guidelines ¶90, 512, 52 Fed Reg 11737 (April 10, 1987). OHA addressed this concern by stating that:

> From the *May 13 Affidavit* and the other information provided by Lubrizol, we affirm our finding in *Lubrizol* that the firm should be considered an end-user of petroleum products. Lubrizol substantially changed the nature of the petroleum products it purchased by adding various chemicals to different types of petroleum products to produce "additive packages." The additive packages were then sold not as petroleum products themselves but as a product which when added to a purchaser's oil would produce a change in the physical and chemical properties of the purchaser's oil. Lubrizol, in creating its products by adding chemicals to the petroleum products it purchased from refineries, substantially changed the form of the petroleum products it purchased. Consequently, we find that Lubrizol was not

9

>a reseller but an end-user of petroleum products. Lubrizol is thus eligible to receive a refund based upon the petroleum products it purchased during the consent order period.

AR-711-712.

Fourth, in response to plaintiffs' related argument that allowing Lubrizol's claim might lead to potential double counting of eligible barrels in the refund proceeding because the additives produced by Lubrizol hypothetically might have been sold to oil companies and sold in another form to other end-users, who might also submit Subpart V refund claims based on the same claimed volumes, OHA stated:

>The Utilities' argument is simply too speculative. We have no evidence indicating what percentage of Lubrizol products were sold to oil companies. Further, it is uncertain how or in what proportions oil companies mixed their Lubrizol products as alleged in the hypothetical. The only evidence in the record that the Utilities point to in support of the validity of the hypothetical is information that indicates that Lubrizol is a "leading supplier to the petroleum industry of chemical additives for lubricants and fuels" and that "major domestic oil companies ... are also significant customers of Lubrizol." See *Objections* at 6 (citing a Lubrizol 1974 annual report and a September 19, 1988 affidavit from Lucy M. Miller). This evidence is not sufficient for us to conclude that granting Lubrizol a refund as an end-user would result in significant double counting of petroleum product gallons for refund purchases.

A.R.712.

Plaintiffs' complaint boils down to repeating its speculative assertions that the award to Lubrizol should be invalidated because Lubrizol was not required to prove the negative of plaintiffs' hypothetical assertion that Lubrizol's claimed volumes might form the basis for a portion of another claimants' refund claims (Complaint ¶ 34); and that Lubrizol was a reseller as opposed to an end-user because there was no evidence that the petroleum utilized had been substantially changed to warrant Lubrizol's claim to a refund (Complaint ¶ 35). As we explain below, OHA correctly credited Lubrizol's evidence over plaintiffs' speculative assertions and its

10

reasonable decision to do so should be upheld by this Court.

## ARGUMENT

**A. Standard of Review**

The standard for review of OHA's decision is set forth in *Phoenix Petroleum Co. v. Federal Energy Regulatory Commission,* 95 F.3d 1555 (Fed. Cir. 1996). In that case the Federal Circuit stated,

> Thus, this court must necessarily apply a standard of review. We see no reason to deviate from the standard of review applied by TECA. As stated in *MAPCO*, the court will set aside an EPAA/ESA agency action if it is in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence. We recognize DOE's administrative expertise, accord the agency's determination great deference, and must approve the DOE decision if there is a rational basis for it. *MAPCO*, 998 F2d 239.

95 F.3d at 1567. This is in accord with earlier TECA precedent in *International Drilling and Energy Corporation v. Watkins,* 920 F.2d 14 (TECA 1990). In that case the court stated,

> Judicial review of an administrative order of the DOE is statutorily established by the Economic Stabilization Act of 1970 (ESA). Section 211(d)(1) of the ESA provides that no order shall be set aside "unless a final judgment determines that such an order is in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence." 12 U.S.C. § 1904 note, incorporated by reference in the Emergency Petroleum Allocation Act of 1973 [EPAA], 15 U.S.C. §754(a)(1). [footnote omitted] The court's role in this judicial review is guided by certain well settled principles:
>
>> A court should recognize the administrative expertise of an agency decision maker and consequently accord the agency's determination "great deference." [citations omitted] Thus "the judicial role requires approval of the DOE's decision if there is a rational basis for it." [citation omitted]

*Id.* at 18. Further, OHA is accorded deference in administering its own regulations and procedures. See *Sinclair Oil Corp. v. Abraham*, 291 F.3d 822, 826-827 (Fed Cir. 2002). This

11

standard remains in effect,[4] and OHA's decision and order must be reviewed against this deferential standard based upon the certified record.

### B. OHA's Refund Award Was Appropriate

1. OHA correctly rejected plaintiffs' contention that Lubrizol be "require[d] to provide evidence which would enable OHA to determine whether the base oils for which it was here awarded refunds could be claimed as the basis for crude oil refunds for one or more other claimants." Complaint, ¶ 34. Based on the answer to this hypothetical assertion, plaintiffs claim that Lubrizol might be an end-user (eligible for a refund) or a reseller (ineligible for a refund), and that given this possible difference in outcomes OHA incorrectly failed to demand more information from Lubrizol. However, having concluded that Lubrizol was an eligible end user based on its purchase of qualifying refined petroleum products which Lubizol then substantially changed by adding various chemicals to produce additives packages, OHA declined as "too speculative" plaintiffs' hypothetical bid to explore the possibility that Lubrizol sold some of its products to oil companies that in turn would process the product into another product that might be included in a portion of another end-users' claim.

OHA explained that it had "no evidence indicating what percentage of Lubrizol products were sold to oil companies." Supplemental Order at 6 (AR-712). The fact that Lubrizol may have supplied additives to the oil industry was deemed "not sufficient for [OHA] to conclude

---

[4] The Temporary Emergency Court of Appeals ("TECA") was established by Section 211(b)(2) of the ESA, as incorporated into Section 5(a)(1) of the EPAA, as the court of appeals with exclusive jurisdiction to entertain appeals from the district courts in cases and controversies arising under the ESA or under regulations or orders issued thereunder. However, the court was dissolved on April 29, 1993, and its jurisdiction transferred to the United States Court of Appeals for the Federal Circuit. Federal Courts Administration Act of 1992, Pub L. No. 102-572, 106 Stat. 4506 (1992). In turn, the Federal Circuit has adopted the precedent of the Temporary Emergency Court of Appeals as its own. *Texas American Oil Corp. v. Department of Energy*, 44 F.3d 1557 (Fed. Cir. 1995) and *Phoenix Petroleum Co. v. Federal Energy Regulatory Commission*, 95 F.3d 1555 (Fed. Cir. 1996).

that granting Lubrizol a refund as an end-user would result in significant double counting of petroleum product gallons for refund purchases." *Ibid*.

Moreover, as OHA pointed out, the crude oil refund proceeding represents a balance between equitable distribution of the overcharge monies and administrative efficiency. Plaintiffs' strict one gallon one refund requirement is contrary to the ground rules established by OHA for the crude oil proceeding. At the outset of the present proceeding in 1987, OHA expressly declined proposals that it protect against double counting in the refund proceeding by omitting from the volumetric refund calculation the volumes of product covered by the claims of settling parties in the *Stripper Well* case. As OHA then explained:

> [A]lthough this type of adjustment has some appeal, it would be difficult to implement as a practical matter. All of the volumes that passed through petroleum product resellers and retailers were ultimately consumed by end-users, some of whom may apply for themselves, and this could produce double or triple counting of volumes. Because of these difficulties, accurately adjusting the number of gallons in the denominator might delay the crude oil refund process for several years. That result would defeat one of the principal purposes of the [*Stripper Well*] settlement: achieving an expeditious resolution of all crude oil overcharge claims.

OHA 1987 Notice, 6 Federal Energy Guidelines ¶ 90,512 at 90,711 n.2; 52 Fed. Reg. 11737, 11740 n.2 (April 10, 1987). As OHA stated in its Supplemental Order approving a refund to Lubrizol,

> To now insist that Lubrizol be forced to provide additional specific data concerning to whom it sold its products and how they were used by the purchaser in order that a further analysis concerning potential double counted gallonage could be made would be inappropriate given the purpose of this proceeding and the ground rules announced at the outset of the proceedings in 1987.

Supplemental Order at 7 (AR-713).

2. As OHA correctly recognized, under the ground rules established for the crude oil refund program, Lubrizol's eligibility for a refund turns on its having made purchases as a qualified end user. Plaintiffs' complaint appears to concede that Lubrizol's submissions and sworn affidavits established that its purchases were all qualifying domestic refined products. Instead, plaintiffs now argue only that Lubrizol should be denied a refund as a reseller on the basis that it did not substantially change the form of the "base oils" it purchased. Complaint, ¶ 35.

During the 1973-1981 period of the former price control regulations, DOE defined a "reseller" as a firm "which carries on the trade or business of purchasing covered products, and resell[s] them without substantially changing their form to purchasers other than ultimate consumers." 10 C.F.R. § 212.31 (1980). Here, ample record evidence supports OHA's finding that Lubrizol had utilized the source crude petroleum to formulate an end product that was different in character from the raw material and which it sold to various consumers. The affidavits and associated documents submitted by Lubrizol in the OHA proceedings demonstrated that the firm was engaged in the manufacture of additive products separate and distinct from the raw material utilized in the manufacture of those products. See May 13 Schoeck Affidavit, AR-524-526; AR-86-90 and AR-169-222 and the Affidavit of David A. Mattson regarding the purchase of raw materials. AR-208-209). As OHA noted the May 13 Schroeck affidavit explained that:

> Lubrizol is a specialty chemical company, and during the period being considered in this matter [the petroleum price control period], Lubrizol was engaged in the making of chemical additives that were sold to companies to be blended with oil to form a finished lubricant product. Additives include such things as: (a) dispersants and detergents, which are chemicals that neutralize combustion by products and hold the products in oil; (b) antioxidants, which prevent oxidation

14

>and oil degradation; (c) friction modifiers and antiwear ingredients, which are chemicals that coat the surfaces that are being lubricated to reduce friction and wear; (d) pour point depressants, which are chemicals that allow better properties for the lubricant at colder temperatures; and (e) viscosity modifiers, which are chemicals that control the viscosity and viscosity change of the lubricant under various conditions. Some of the chemical components are mixtures of chemicals and oil. For those, oil is an integral part of their manufacture. The concentrated formulation of chemical components that Lubrizol makes and then sells is often called an "additive package." While Lubrizol does sell some components by themselves, the bulk of Lubrizol's sales are additive packages. The additive package is not a finished lubricant product and not something refiners make.

Supplemental Order at 5, AR-711.

Based on these submissions by Lubrizol, OHA concluded that Lubrizol should be considered an end-user of petroleum products and thus eligible for a crude oil refund. OHA determined that Lubrizol substantially changed the nature of the petroleum products it purchased by adding various chemicals to produce additive packages. These packages were not sold as petroleum products but as a product to be added to a purchaser's oil and produce a change in the physical and chemical properties of the purchaser's oil. Plaintiffs' speculation about possible double counting does not refute OHA's well supported finding that Lubrizol substantially changed the form of the petroleum products it purchased and thus was not a "reseller."

## CONCLUSION

For the foregoing reasons, plaintiffs' complaint should be dismissed and judgment entered for the Government.

Respectfully submitted,

_____
THOMAS H. KEMP
STEPHEN C. SKUBEL
U.S. Department of Energy
Office of the General Counsel
Rm. 6H-045 (GC-32)
1000 Independence Ave., S.W.
Washington, D.C. 20585

DATE: December 12, 2005.                Telephone: (202) 586-8700